**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 12-2496
_____

ROMELIA GOMEZ-SALGUERO,

                                        Petitioner

v.

ATTORNEY GENERAL OF THE UNITED STATES,

                                        Respondent
_____

On a Petition For Review of an Order
of the Board of Immigration Appeals
(Agency No. A072-374-099)
Immigration Judge:  Honorable Eugene Pugliese
_____

Submitted Pursuant to Third Circuit LAR 34.1(a)
December 19, 2012

Before:  FISHER, GARTH and ROTH, Circuit Judges.

(Filed: February 1, 2013)
_____

OPINION
_____

PER CURIAM

        Romelia Gomez-Salguero petitions for review of the Board of Immigration

Appeals' final order of removal.  For the reasons that follow, we will deny the petition for

review.

Gomez-Salguero, a native and citizen of Guatamala, last entered the United States illegally in August 2006. She had previously lived in the United States without documentation from 1993 until her return to Guatemala, pursuant to a Voluntary Departure Order, on December 9, 2004. Gomez-Salguero is removable under Immigration & Nationality Act ("INA") § 212(a)(6)(A)(i), 8 U.S.C. § 1182(a)(6)(A)(i), as an alien present in the United States without being admitted or paroled. She applied for statutory withholding of removal under INA § 241(b)(3), and for protection under the Convention Against Torture, 8 C.F.R. §§ 1208.16(c), 1208.18. According to her affidavit, Gomez-Salguero is divorced and has two children. Her youngest, Jesenia Victoria Vasquez, is a United States citizen who resides in New Jersey. Jesenia remained behind in the United States when Gomez-Salguero departed in 2004 because Gomez-Salguero feared that her former common-law husband, Ever Vasquez, would try to take Jesenia.

Also according to her affidavit, upon her arrival in Guatemala, Vasquez did in fact threaten to hurt Gomez-Salguero if she did not bring Jesenia to Guatemala. Vasquez is a member of MS-13, Gomez-Salguero believes. Fifteen days after he threatened her, five men broke into the house where she was staying and punched and kicked her. Her niece's husband also was beaten. Gomez-Salguero was hospitalized for two days. She then went to live with her brother, according to her affidavit, but Vasquez came back to threaten her and her brother. She sought help from the Mayor of San Pedro Pinula, and received it, but Vasquez persisted with his threats to kill her and harm her family.

2

Gomez-Salguero left Guatemala in fear of Vasquez and returned to the United States. In her affidavit, she claimed that Vasquez and his gang will kill her if she returns to Guatemala, and he also will try to get custody of Jesenia.

At her merits hearing on October 16, 2009, Gomez-Salguero argued, through counsel, that she is protected under the INA as an ex-spouse of a gang member. She testified that Jesenia was born in 1995, and Vasquez is her father. She met Vasquez in 1994 in the United States; they were never married. Vasquez came to the United States on a work permit but returned to Guatemala in 1997 and joined the gang. He never provided support for Jesenia. Since his return to Guatemala, he has contacted Jesenia only once in 1998. Gomez-Salguero testified that she has six brothers, all of whom live in Guatemala. She testified concerning Vasquez's threats on January 7, 2005, once she returned to Guatemala. He said "bring the girl, or you're going to pay for it." A.R. 111. She testified that in March 2005, he returned and cut her on her eye, her knee and her calf with a razor. She saw a doctor following this assault. She fled to San Pedro Pinula where her brother lives, but Vasquez found out and threatened her again. She contacted the police but they did not help because Vasquez and his gang had already left the area. The Mayor gave her a little help, she testified, and he submitted a letter in support of her application. Vasquez told Gomez-Salguero's niece not to get involved and that he was going to cut Gomez-Salguero's face into little pieces. Gomez-Salguero could not take the fear anymore, and her family helped her to return to the United States.

3

On cross-examination, Gomez-Salguero was questioned about her Exhibit "5," a police report from January 7, 2005, which stated that Gomez-Salguero had reported that unknown individuals shot at her bedroom door. Gomez-Salguero was asked why she omitted any reference to this shooting in her direct testimony and why she did not identify Vasquez and his gang as her attackers. She was asked why she omitted any reference to having been cut with a razor in her affidavit. She explained that she was afraid of Vasquez. She forgot to mention the gunshots because she was nervous. It did not occur to her to mention the razor in her affidavit.

Medical records from a medical clinic at the University of San Carlos in Guatemala City stated that Gomez-Salguero visited the clinic on March 17, 2005. She had lacerations on her arms, face, knees and head. She had a short, blunt cut to her lower lip and was very distraught. Additionally, statements from Gomez-Salguero's two nieces attesting to Gomez-Salguero's having been physically abused by her husband also were submitted, see A.R. 214, 217. Gomez-Salguero also submitted the 2008 State Department Human Rights Report for Guatemala.

Following the hearing, the Immigration Judge denied relief. The IJ concluded that Gomez-Salguero's testimony was not credible. In addition, the particular social group she identified – ex-spouses of gang members – did not enjoy protection under the INA. With respect to her CAT application, the IJ found that there was nothing in the State Department report that suggested that Gomez-Salguero was at risk for being tortured in

4

Guatemala by the government or anyone associated with the government. The IJ ordered that Gomez-Salguero be removed to Guatemala.

Gomez-Salguero appealed to the Board of Immigration Appeals, arguing that the IJ's adverse credibility determination was flawed, the IJ failed to explore whether one of the motivations for the persecution was her membership in a particular social group composed of Guatemalan women who have been in an intimate relationship with a man who believes in imposing domination over women by force, and the IJ failed to explore evidence that part of the motivation for the persecution was the anti-gang political opinion imputed to her.

In a decision dated April 30, 2012, the Board dismissed the appeal. The Board concluded that the IJ's adverse credibility determination was not clearly erroneous. *See* 8 C.F.R. § 1003.1(d)(3)(i). According to the Board, the IJ correctly found that Gomez-Salguero's account contained inconsistencies or omissions regarding her knowledge of who came to her house on January 7, 2005; whether gunshots were fired inside the house; and whether she was attacked with a razor. The Board also agreed with the IJ's conclusion that Gomez-Salguero's explanations for the inconsistencies and omissions were inadequate. In addition, the Board held that the IJ properly found implausible the idea that Vasquez was desperate to gain custody of his daughter after years of expressing no interest whatever in her. The discrepancies found by the IJ, the Board held, were not immaterial or of little relevance to her claim; on the contrary, they were central to it. The Board concluded in the alternative that Gomez-Salguero had not established a nexus to a

5

protected category. The Board concluded that Gomez-Salguero did not show that the group, "ex-spouses of gang members," shared a common immutable characteristic, or that she faced harm on a account of membership in a protected group, rather than on account of a personal dispute with her daughter's biological father, citing Fatin v. Immigration & Naturalization Serv., 12 F.3d 1233 (3d Cir. 1993), and Garcia v. U.S. Att'y Gen. of the U.S., 665 F.3d 496, 504 n.5 (3d Cir. 2011). The Board would not address for the first time on appeal Gomez-Salguero's contention concerning Guatemalan women who have been intimate with a domineering and violent man, or her anti-gang imputed political opinion argument, because she did not raise these issues first in Immigration Court. The Board also agreed that Gomez-Salguero did not show that if removed to Guatemala it was more likely than not that she would be tortured by or with the consent of the government.

Gomez-Salguero timely petitions for review. We have jurisdiction under 8 U.S.C. §§ 1252(a)(1), (b)(1). In her brief, she contends that the Board erred in upholding the IJ's adverse credibility determination, and in concluding that she failed to prove persecution on the basis of her membership in a particular social group. Specifically, Gomez-Salguero argued that the IJ's speculation about her ex-boyfriend's interest, or lack thereof, in their daughter undermined the entire adverse credibility determination and violated her right to due process, the agency's insistence that her particular social group of former common-law spouses of gang members possess the elements of "social visibility" and "particularity" was contrary to our decision in Valdiviezo-Galdamez v.

Att'y Gen. of the U.S., 663 F.3d 582, 608 (3d Cir. 2011); and she indeed had met her statutory withholding of removal burden of proof to show persecution on the basis of a protected category, and her burden to show that it was more likely than not that she would be tortured in Guatemala by the same individuals who previously assaulted her.

We will deny the petition for review. When the Board issues a separate opinion, we review the Board's disposition and look to the IJ's ruling only insofar as the Board deferred to it. Chavarria v. Gonzalez, 446 F.3d 508, 515 (3d Cir. 2006). The agency's factual determinations are upheld if they are supported by reasonable, substantial, and probative evidence on the record considered as a whole. Immigration & Naturalization Serv. v. Elias-Zacarias, 502 U.S. 478, 481 (1992). Under this deferential standard, the petitioner must establish that the evidence does not just support a contrary conclusion but compels it. See id. at 481 n.1; Gao v. Ashcroft, 299 F.3d 266, 272 (3d Cir. 2002). Adverse credibility determinations are reviewed under the substantial evidence standard. See Xie v. Ashcroft, 359 F.3d 239, 243 (3d Cir. 2004). The INA provides that:

> Considering the totality of the circumstances, and all relevant factors, a trier of fact may base a credibility determination on the demeanor, candor, or responsiveness of the applicant or witness, the inherent plausibility of the applicant's or witness's account, the consistency between the applicant's or witness's written and oral statements (whenever made and whether or not under oath, and considering the circumstances under which the statements were made), the internal consistency of each such statement, the consistency of such statements with other evidence of record (including the reports of the Department of State on country conditions), and any inaccuracies or falsehoods in such statements, without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim, or any other relevant factor.

7

8 U.S.C. § 1158(b)(1)(B)(iii).

Substantial evidence supports the adverse credibility determination made in Gomez-Salguero's case because of several material inconsistencies. Specifically, Gomez-Salguero testified that Vasquez attacked her with a razor in March 2005 but she did not mention this in her affidavit; the police report from the January 7, 2005 incident indicated that Gomez-Salguero did not know her assailants but she testified that Vasquez and his gang attacked her; and the same police report indicated that the (unknown) assailants shot at her bedroom door but she made no mention of any shooting in either her affidavit or her testimony. Gomez-Salguero's explanation for the inconsistencies and omissions was unsatisfactory. As to her specific contention on appeal, even if we agree with her that the agency erred in speculating that Vasquez was not currently interested in his daughter because he had previously shown little interest in her, see, e.g., Tang v. Att'y Gen. of the U.S., 578 F.3d 1270, 1278 (11th Cir. 2009), we do not agree that the entire adverse credibility determination was thereby undermined. The three inconsistencies concerning the razor, the shooting, and the identity of her assailants go to the heart of her claim of persecution and are sufficient to support the adverse credibility determination, even if the agency's conclusion that Vasquez was not currently interested in Jesenia does not necessarily flow from the finding that he showed little interest in her prior to her mother's return to Guatemala in 2004.

We also reject as meritless Gomez-Salguero's argument that the IJ applied the requirements of "social visibility" and "particularity" we found improper in Valdiviezo-

8

Galdamez.  In Valdiviezo-Galdamez, "we held that the [Board failed] to sufficiently explain and justify its addition of 'particularity' and 'social visibility' to the traditional *Acosta* requirements . . . [and] [u]ntil the [Board] provides an analysis that adequately supports its departure from *Acosta*, we remain bound by [its] well-established definition of 'particular social group.'"  Garcia, 665 F.3d at 504 n.5 (citing Matter of Acosta, 19 I. & N. Dec. 211 (BIA 1985), and Fatin, 12 F.3d 1233).  By citing Garcia and Fatin, the Board made clear that it was applying the Acosta immutability standard, not the visibility or particularity standards, and our review is limited to the Board's decision because it did not defer to the IJ's decision on this issue.  See Chavarria, 446 F.3d at 515.

Under INA § 241(b)(3)(A), 8 U.S.C. § 1231(b)(3)(A), withholding of removal is not discretionary:  "The Attorney General may not remove an alien to a country if the Attorney General decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group or political opinion."  But the test for relief is more demanding than the asylum test and requires the alien to show by a "clear probability" that her life or freedom would be threatened on account of a protected ground in the proposed country of removal.  Immigration & Naturalization Serv. v. Stevic, 467 U.S. 407 (1984).  See also Immigration & Naturalization Serv. v. Cardoza-Fonseca, 480 U.S. 421, 430 (1987) ("would be threatened" standard has no subjective component).

The Board concluded that Gomez-Salguero failed to demonstrate that her group – former common-law spouses of gang members – shared a common, immutable

9

characteristic. Substantial evidence supports the Board's conclusion that this group shares no common, immutable characteristics.[1] Moreover, when asserting a withholding of removal claim, a petitioner must show both that she is a member of a particular social group as defined by the Act and that it is more likely than not that she will be persecuted on account of her membership in that group. 8 U.S.C. § 1231(b)(3)(A); 8 C.F.R. § 1208.16(b). Here, substantial evidence in the record supports the agency's conclusion that Gomez-Salguero failed to meet her burden of proof to show that it is more likely than not that she will be persecuted even if it is assumed that she is member of a particular social group as defined by the INA. When asked to identify a motive for Vasquez's actions, Gomez-Salguero testified that he was upset because he was disappointed that his daughter was not coming to Guatemala and because he did not want Gomez-Salguero to have their daughter, A.R. 119. Thus, the only reason Gomez-Salguero established for Vasquez's actions was his personal animosity toward her. As the Board concluded, Gomez-Salguero showed only that she faced harm on a account of a personal dispute

---

[1] Acosta defines a "particular social group" as:

> [A] group of persons all of whom share a common, immutable characteristic. The shared characteristic might be an innate one such as sex, color, or kinship ties, or in some circumstances it might be a shared past experience such as former military leadership or land ownership. [W]hatever the common characteristic that defines the group, it must be one that the members of the group either cannot change, or should not be required to change because it is fundamental to their individual identities or consciences.

19 I. & N. Dec. at 233.

with her daughter's biological father, rather than on account of her membership in a protected group. The lack of a nexus thus constituted a proper alternative basis for the agency's decision.

Last, the agency concluded that Gomez-Salguero did not meet her burden of establishing that it is more likely than not that she will be tortured upon her return to Guatemala by forces the Guatemalan government is unable or unwilling to control. 8 C.F.R. § 1208.16(c)(2). The record does not compel a different conclusion. Although the State Department report states that generalized violence, and domestic violence in particular, remains a problem in Guatemala, the government has taken steps to curb violence and to prosecute complaints of domestic violence. The Guatemalan government also operates shelters for victims of abuse. A.R. 169. In addition, in Gomez-Salguero's case, the authorities made an effort to protect her.

For the foregoing reasons, we will deny the petition for review.